UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DARREL SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 09-cv-3615 |
| v. | ) | |
| | ) | Judge John W. Darrah |
| JAMES BIANCHETTA and | ) | |
| DENISE BRAY, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

On June 15, 2009, Plaintiff Darrel Smith filed a complaint against

Lyondell Chemical Company ("Lyondell"), Equistar Chemicals, LP ("Equistar"), and

two individual Defendants, James Bianchetta and Denise Bray. In a letter

dated July 7, 2009, Lyondell notified Smith that Lyondell and Equistar had filed for

bankruptcy and that Smith's complaint was in violation of the Bankruptcy Code's

automatic stay. On July 15, 2009, Smith voluntarily dismissed his complaint.

On April 20, 2010, after obtaining leave of court, Smith filed a two-count

Amended Complaint against Bianchetta and Bray only. This case is presently before the

Court on both Defendants' motions for summary judgment. For the reasons discussed

below, Bianchetta's motion is granted in part and denied in part, and Bray's motion is

granted in its entirety.

# BACKGROUND

The following facts are taken from the parties' statements of undisputed material facts submitted in accordance with Local Rule 56.1. Local Rule 56.1(a)(3) requires the party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue." Rule 56.1(b)(3) then requires the nonmoving party to admit or deny each factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). A litigant's failure to dispute the facts set forth in its opponent's statement in the manner required by Local Rule 56.1 results in those facts' being deemed admitted for purposes of summary judgment. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).[1]

Smith is an African American who worked as a Process Technician at Equistar, beginning November 6, 2000. (Bianchetta 56.1(a)(3) ¶¶ 1, 6.) From June 2003 through the end of Smith's employment on August 4, 2006, Defendant Bianchetta was Smith's direct supervisor. (Bianchetta 56.1(a)(3) ¶¶ 2, 7.) During that same time period, Defendant Bray was the manager of Equistar's Human Resources Department. (Bianchetta 56.1(a)(3) ¶¶ 3, 8.)

---

[1] Along with their reply briefs, Defendants filed a joint motion to strike portions of Smith's Local Rule 56.1 materials. Both Defendants also raised a number of general objections in their Local Rule 56.1 responses. The Court denied the motion but stated that it would consider its substance in resolving these motions for summary judgment. Many of Defendants' objections are meritorious. Smith's Local Rule 56.1(b)(3)(C) statement is replete with statements that are compound, conclusory, based on inadmissible hearsay, lacking in foundation, supported by missing exhibits, and provided without context. The Court is entitled to expect strict compliance with its local rules regarding summary judgment. *Koszola v. Bd. of Educ. of Chi.*, 385 F.3d 1104, 1109 (7th Cir. 2004). Accordingly, many of Smith's factual assertions were disregarded.

On June 19, 2006, Smith received a note from his doctor, stating that he should remain off of work for two weeks because of purported stress. (Bianchetta 56.1(a)(3) ¶ 49.) He never returned to work. (Bianchetta 56.1(a)(3) ¶ 49.) The same day he received the note from his doctor, Smith applied for short-term disability benefits through Concentra, a third-party firm that processed and made decisions with respect to employees' applications for medical leave and disability. (Bianchetta 56.1(a)(3) ¶¶ 17, 50, 51.) Smith informed Bianchetta that his doctor had put him off of work for two weeks (Pl. 56.1(b)(3)(C) (Bianchetta) ¶ 39); and he kept in touch with Concentra's representatives "regularly" about his application for short-term disability benefits (Bianchetta 56.1(a)(3) ¶ 52).

On June 23, 2006, Concentra called Smith's doctor to request that he talk with a Concentra doctor about his application. (Bianchetta 56.1(a)(3) ¶ 53.) Apparently, that request was not successful. Smith received a letter from Concentra, dated June 28, 2006, which states in part:

> Integrated Choice provides disability management services for your employer. Our role as a disability management company is to coordinate and facilitate a reasonable and timely return to work based on the information provided to us by your treating physician and your employer. Despite several attempts, we were unable to obtain sufficient information to complete your disability review. Due to this lack of information, no recommendation can be made regarding your claim from 6/21/2006. Please contact your provider and request that he or she call me as soon as possible . . . to complete the review process. If you have any questions regarding this request, please feel free to call me. Our recommendations are not guarantees that benefits are or are not payable by the claims administrator. The payment of benefits is subject to the claims administrator's determination of eligibility and benefit coverage.

(Bianchetta 56.1(a)(3) ¶ 54.)

On July 6, 2006, Smith received another note from his doctor, stating that he should remain off from work for an additional thirty days. (Bianchetta 56.1(a)(3) ¶ 55.) Smith sent a fax to Concentra the following day, stating, in part:

> I went to the doctor today, 07/06/06 at 1300pm, Dr. Steven Nemeth, MD, has me off for another 30 days. I spoke with the Dr. about setting up a conference call with Concentra's Dr., He implied that he filled out the proper paperwork, and this office have answered all question, that Conetra ask. I do not know where to go from here, but my Family Leave Act is being denied and I am being ask to question a professional decision and integrity. Concentra is the contracted outside firm that is to deal with this issue. I'm being denied the Family Leave Act and my benefits are being held up when all proper paper work was turned in. Were do we go from here? I can not make a professional talk, when he said, he filled out all the paperwork.

(Bianchetta 56.1(a)(3) ¶ 56 (grammatical errors in original).)

Smith called his doctor's office on July 10, 2006, and asked whether the doctor would "reconsider" adjusting his schedule so that he could coordinate with Concentra. (Bianchetta 56.1(a)(3) ¶ 57.) Concentra's doctor called Smith's doctor's office on July 21, 2006, to request to speak with him about Smith's application. (Bianchetta 56.1(a)(3) ¶ 57.) It is not clear whether that request was successful; but in a letter dated that same day, Concentra denied Smith's short-term disability application:

> Based on our review of the available information, no period of disability is recommended from 06/21/2006. . . . If you and your provider disagree with our recommendation, you or your provider may initiate an appeal.

(Bianchetta 56.1(a)(3) ¶ 59.)

Smith appealed Concentra's decision by letter, providing, in part:

> I Darrel Smith was able to obtain my medical records from the Dr. Steven Nemeth office. Regrettable for unknown reasons I was unable to facilitate a conference call between my doctor and Concentra's physician. I writing in regards to an appeal for disability or workman's

4

compensation which have been withheld due to the inability to facilitate. I have included a copy of my last two visits which was excusing my absents from work. Hopeful this information will be helpful and useful in coming to an conclusion.

(Bianchetta 56.1(a)(3) ¶ 60 (grammatical errors in original).) Concentra acknowledged receipt of Smith's appeal by letter dated July 28, 2006, which informed him that he should "promptly forward all necessary medical information to the Integrated Choice Appeals Coordinator via mail or fax." (Bianchetta 56.1(a)(3) ¶ 61.)

Plaintiff did not take any further action with Concentra after receiving this letter; and, in a letter from Concentra dated August 1, 2006, Smith's appeal was ultimately denied:

> This letter states the outcome of the appeal regarding your disability claim. The appeal process consisted of a review of the available information by a physician advisor who was not involved in the original recommendation.
>
> Appeal Issue: The medical necessity of Short Term Disability from 6/21/2006 forward.
>
> Outcome: The original physician advisor's recommendation has been sustained. The appeal review was unable to establish the medical need for Short Term Disability.
>
> Recommendation: Short Term disability is not recommended from 6/21/2006 forward.

(Bianchetta 56.1(a)(3) ¶ 62.)

When Concentra notified Equistar that Smith's appeal had been denied based on a lack of medical support, Bray asked the Plant Manager, Richard Purgason, what he wanted to do about it. (Bianchetta 56.1(a)(3) ¶ 65.) Purgason considered Smith to be absent without leave and said they should request Smith's termination. (Bianchetta 56.1(a)(3) ¶ 65.)

On Friday, August 4, 2006, Smith was sent a letter (signed by Bray), notifying him that, because his absence was not certified by medical case management, he was considered absent without leave "in clear violation of the Company's policies and procedures" and that his employment was thus terminated for job abandonment. (Bianchetta 56.1(a)(3) ¶ 68.) This letter was the only indication Smith received as to why his employment was terminated. (Bianchetta 56.1(a)(3) ¶ 70.) That same day, prior to receiving this letter in the mail, Smith had an appointment with his doctor and was going to tell him he was feeling "great" and "well rested." (Bianchetta 56.1(a)(3) ¶ 69.) Smith also called Bianchetta and asked if he could be included on the work rotation for Sunday evening. (Bianchetta 56.1(a)(3) ¶ 69.) On August 8, 2006, Smith received a note from his doctor, stating that he could return to work on August 9, 2006. (Bianchetta 56.1(a)(3) ¶ 74.)

Another Equistar employee, Jason Corneglio, was on medical leave for several months in 2007; he is still employed. (Pl. 56.1(b)(3)(C) (Bianchetta) ¶ 27.) From 2003 through 2007, there were no instances at Equistar's Morris, Illinois facility where any employee was allowed to return to work after taking a purported disability leave that was not supported by medical evidence. (Bianchetta 56.1(a)(3) ¶ 67.)

Smith's stress-related departure was purportedly caused by a history of escalating racial discrimination in his workplace, beginning in December 2004. (Bianchetta 56.1(a)(3) ¶ 79.) The earliest purported discrimination appears to be Smith's receipt of an extra assignment of duties. From 2004 until approximately January 2006, Smith was sometimes temporarily moved from his Process Technician duties to work as a

Warehouse Technician.  (Bianchetta 56.1(a)(3) ¶ 18.)  He was assigned these duties, however, because he was trained as a Warehouse Technician and because he had the least seniority of the Process Technicians on his shift.  (Bianchetta 56.1(a)(3) ¶¶ 19, 20.) Tim Brown, a Caucasian Process Technician on another shift, also performed Warehouse Technician duties during that time period because, like Smith, he was qualified and had the least seniority on his shift.  (Bianchetta 56.1(a)(3) ¶ 21.)  In April 2005, Equistar hired two full-time Warehouse Technicians; and Plaintiff trained them.  (Bianchetta 56.1(a)(3) ¶ 22.)

Most of Smith's complaints involve disputes with Bianchetta and other workers. In 2004, Smith complained "several" times to Bianchetta, Bray, and Joy Nixon (another Human Resources representative) about Mark Hieser (a Caucasian Process Technician on another shift), who Smith claimed was "not doing his job."  (Bianchetta 56.1(a)(3) ¶ 27; Bray 56.1(a)(3) ¶ 18.)  Bianchetta notified Hieser's supervisor about Smith's complaints. (Bianchetta 56.1(a)(3) ¶ 28.)  Hieser, in turn, complained that Smith was leaving him with "bad relief" by not cleaning up at the end of his shift.  (Bianchetta 56.1(a)(3) ¶ 29.)

On February 23, 2005, a company employee made an anonymous hotline complaint about Smith's use of incorrect materials, which necessitated scrapping 70,000 pounds of plastic pellets and Hieser's being instructed to draft a statement about the scrapped material.  (Bianchetta 56.1(a)(3) ¶ 30.)  The caller also asserted that Smith became aware of Hieser's statement one week later, called Hieser a "racist bigot mother f----er," and told Hieser, "The gloves are off.  I'll get even after this."  (Bianchetta 56.1(a)(3) ¶ 31.)  Hieser reported the incident to Bray, who investigated it by

interviewing employees and conferring with Equistar's in-house counsel. (Bianchetta 56.1(a)(3) ¶ 32; Bray 56.1(a)(3) ¶ 21.) When Bray interviewed Smith, Smith denied making the statements. (Bianchetta 56.1(a)(3) ¶ 33.) Smith was not disciplined. (Bianchetta 56.1(a)(3) ¶ 33.)

On or about October 9, 2005, Smith and Mike Oelschlager, a Caucasian Process Technician on his shift, had a verbal altercation about Smith's responsiveness to an alarm. (Bianchetta 56.1(a)(3) ¶ 23.) Smith complained to Bianchetta about the incident and told Bianchetta that Smith thought either he or Oelschlager would need to leave the area. (Bianchetta 56.1(a)(3) ¶ 24.) Bianchetta contacted Bray about the situation. (Bianchetta 56.1(a)(3) ¶ 25.) Bray said that if Smith left work without permission, management could consider his conduct as grounds for termination. (Bianchetta 56.1(a)(3) ¶ 25.) Bianchetta then investigated Smith's complaint about Oelschlager and documented a verbal warning to Oelschlager. (Bianchetta 56.1(a)(3) ¶ 26.)

Smith also complains that he was not promoted to the highest possible pay grade. Equistar's employees were classified into pay grades, ranging from S1 through S4 – S4 being the highest. (Bianchetta 56.1(a)(3) ¶ 35.) For a Process Technician to receive an S4 pay grade, the employee's Unit Superintendent and all Shift Supervisors had to agree unanimously that the employee met the necessary qualifications; their recommendation then had to be approved by a panel of all management employees at Equistar's Morris, Illinois facility. (Bianchetta 56.1(a)(3) ¶ 37.) Bray did not have a decision-making role with respect to pay level. (Bray 56.1(a)(3) ¶ 11.) Bianchetta discussed, with other Shift Supervisors, assigning Smith and another African American Process

Technician on his shift to an S4 pay grade, but the recommendations were not met with unanimous consent. (Bianchetta 56.1(a)(3) ¶ 38.) Smith testified that Bianchetta told him it was because black people are not smart enough for a promotion. (Pl. 56.1(b)(3)(C) (Bianchetta) ¶ 23.)

In January 2006, Smith volunteered for a project "in an effort to reestablish [his] reputation as a good worker" and be eligible for an S4 pay grade. (Bianchetta 56.1(a)(3) ¶ 39.) The project required Smith to identify, test, and label hundreds of breakers in the Morris, Illinois facility and populate an electronic spreadsheet to create a book identifying the breakers. (Bianchetta 56.1(a)(3) ¶ 40.) At Smith's request, Smith worked on the day shift while working on the breaker project. (Bianchetta 56.1(a)(3) ¶ 41.) While on the day shift, Smith was self directed and reported to whichever supervisor was on duty. (Bianchetta 56.1(a)(3) ¶ 42.)

At some point while Smith was working on the breaker project, an employee placed a sign in his work area that stated, "DVL," meaning, "do very little." (Bianchetta 56.1(a)(3) ¶ 45.) On April 9, 2006, one of Equistar's employees made an anonymous hotline complaint about Smith's sleeping on the job and keeping inaccurate time records. (Bianchetta 56.1(a)(3) ¶ 43.) Although Smith was not disciplined for sleeping on the job, he and other employees did receive verbal reprimands for keeping inaccurate time records. (Bianchetta 56.1(a)(3) ¶ 44.)

Smith stopped working on the breaker project on May 1, 2006; the project was not yet complete. (Bianchetta 56.1(a)(3) ¶ 46.) Bianchetta asked Smith to provide the work he had done on the project to another employee who was taking over, but Smith

9

refused to do so. (Bianchetta 56.1(a)(3) ¶ 47.) Around June 7, 2006, Bianchetta issued Smith written discipline for deleting the electronic spreadsheet, which Equistar's Information Technology Department recovered and found to be largely blank. (Bianchetta 56.1(a)(3) ¶ 48.) Smith claims his work was erased by coworkers. (Pl. 56.1(b)(3)(C) (Bianchetta) ¶ 21.)

Throughout the course of his employment, Smith prepared notes and summaries of alleged behavior by various people at Equistar, including a number of allegations about racist and highly offensive remarks made by Bianchetta to Smith or in Smith's presence. (Bianchetta 56.1(a)(3) ¶¶ 75, 77; Pl. 56.1(b)(3)(C) (Bianchetta) ¶ 2.) The notes reflect behavior that occurred before April 20, 2006, a date which, as discussed below, is important for purposes of the relevant statute of limitations. (Bianchetta 56.1(a)(3) ¶ 76.) When asked at his deposition over what period of time Bianchetta made the offensive comments, Smith replied, "It might vary. Might be weeks, months, or even a year"; but Smith also testified that between June of 2003 and June of 2006, "it wasn't a week went by where the harassment and racial conversations took place between [Bianchetta] and [Smith]" and that Bianchetta sometimes called him into his office, closed the door, and subjected him to racial tirades lasting up to twelve hours. (Bianchetta 56.1(a)(3) ¶ 77; Pl. 56.1(b)(3)(C) (Bianchetta) ¶ 12.) Another employee testified that the arguments between Smith and Bianchetta got worse in the months leading up to Smith's termination and that these conversations occurred at least once a week towards the end. (Pl. 56.1(b)(3)(C) (Bianchetta) ¶ 16.) Smith's notes disclose only one incident that specifically occurred after April 20, 2006: he asserts that garbage and feces were placed

in his locker by unknown employees during the week of June 14, 2006. (Bianchetta 56.1(a)(3) ¶ 78.) There is no evidence that ties Binachetta to anything placed in Smith's locker.

Smith told Bianchetta that he did not approve of his racist remarks and that he found them offensive. (Pl. 56.1(b)(3)(C) (Bianchetta) ¶ 29.) He also complained to his coworkers and his superintendent about the perceived harassment by Bianchetta and Smith's coworkers. (Pl. 56.1(b)(3)(C) (Bianchetta) ¶ 33.) After Smith complained to the Human Resources Department, Bianchetta told one of Smith's coworkers that he was upset Smith had complained about him and that he was going to "get" Smith. (Pl. 56.1(b)(3)(C) (Bianchetta) ¶ 35.) Also, according to the testimony of some of Smith's coworkers, near the time when Smith was terminated, Bianchetta said, "I got him now; he's gone and he ain't coming back." (Pl. 56.1(b)(3)(C) (Bianchetta) ¶ 36.) When Bianchetta learned that Smith retained a lawyer, he told Smith it was the worst thing he could have done, that he was going to tell Bray about it, and that Smith would be sorry. (Pl. 56.1(b)(3)(C) (Bray) ¶ 14.)

Smith complained to Joy Nixon from Human Resources several times about harassment by coworkers and perceived discrimination by Bianchetta; and each time he complained, Nixon relayed his comments to Bray. (Pl. 56.1(b)(3)(C) (Bray) ¶ 5.) Per Equistar's policy, if it was discovered that an employee had racially harassed another employee, the matter would be elevated to the corporate Human Resources Department. (Pl. 56.1(b)(3)(C) (Bray) ¶ 3.) Bray thoroughly investigated complaints brought by Smith's coworkers and thoroughly investigated complaints brought against Smith.

11

(Pl. 56.1(b)(3)(C) (Bray) ¶ 8.) She did not recall ever discussing allegations of harassment or discrimination against Smith with anyone in the corporate office. (Pl. 56.1(b)(3)(C) (Bray) ¶ 3.)

Bray testified that her role in disciplinary decisions was limited to fact gathering and coordination and that she did not decide what discipline would occur. (Bray 56.1(a)(3) ¶ 10.) Smith argues otherwise, citing to testimony of Superintendent James Arrajj, which purportedly indicates that Bray *was* involved in the decision-making process. (Pl. Resp. to Bray 56.1(a)(3) ¶ 10.) Arrajj's testimony is vague. In response to a question regarding whether Bray recommended that Smith be issued a written warning for his work on the breaker project, Arrajj stated, "We would have debated it; but, you know, this was something that often was done by consensus, and so we would have reached an agreement. And often – I mean, for written warnings, occasionally my boss was consulted, but not necessarily every time." (Arrajj Dep. Vol. II, at 37.)

Bray did not have a decision-making role with respect to the approval of disability benefits or medical leave of Smith or any other Process Technicians. (Bray 56.1(a)(3) ¶ 15.) Nor did she have any decision-making role with respect to post-termination benefits. (Bray 56.1(a)(3) ¶ 17.) Bray also testified that she did not have a decision-making role with respect to termination decisions. (Bray 56.1(a)(3) ¶¶ 12-13.) Rather, the superintendent and plant manager would determine whether a disciplinary issue warranted a request for termination, and Bray would coordinate pulling together the request in front of her regional manager, the termination representative, and the legal department. (Bray 56.1(a)(3) ¶ 14.) She did write a first-person report, requesting

Smith's termination, however; and Purgason testified that human resources managers, such as Bray, were involved in termination decisions to some degree. (Pl. Resp. to Bray 56.1(a)(3) ¶ 13.) Arrajj, on the other hand, testified that he was not sure what termination authority, if any, Bray had. (Pl. Resp. to Bray 56.1(a)(3) ¶ 13.)

Although Bianchetta and Bray were both responsible for investigating complaints of discrimination involving employees on Bianchetta's shift (Pl. 56.1(b)(3)(C) (Bianchetta) ¶ 28), they did not discuss Equistar's decision to terminate Smith's employment (Bianchetta 56.1(a)(3) ¶ 72). In fact, Bianchetta testified that he was not involved in the termination of *any* employees from 2003 through 2008. (Bianchetta 56.1(a)(3) ¶ 14.) Smith argues otherwise, asserting that he called Bianchetta the second day he was absent and that Bianchetta told Smith he thought he was faking his illness and that he and Bray decided Smith was gone and that he would not be coming back. (Pl. Resp. to Bianchetta 56.1(a)(3) ¶ 14; Pl. 56.1(b)(3)(C) (Bianchetta) ¶ 38.) Bianchetta also instructed his employees not to accept any phone calls from Smith while he was out. (Pl. 56.1(b)(3)(C) (Bianchetta) ¶ 37.) Smith also testified that he paged Bray and that Bray called him back and said, "[I]f [Bianchetta] is not going to talk to you, I'm not going to talk to you." (Pl. 56.1(b)(3)(C) (Bray) ¶ 18.) Bray denies ever saying this.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the

absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment; nor is a metaphysical doubt as to the material facts. *Robin v. Espo Eng. Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (citations omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255). The court does not make credibility determinations or weigh conflicting evidence. *Id.*

## ANALYSIS

Count I asserts a claim of racial discrimination pursuant to 42 U.S.C. § 1981 against Bianchetta only. Count II asserts a § 1981 claim of retaliation against both Bianchetta and Bray. Both Defendants have moved for summary judgment on all counts against them.

*Bankruptcy Court Order*

As an initial matter, both Defendants argue that Smith's claims against them were waived by operation of Equistar's Chapter 11 plan of reorganization in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). According to the Bankruptcy Court order from April 16, 2009, creditors of Equistar who failed to file proofs of claims by a certain date would be barred from later asserting such claims against Equistar, the debtors. Equistar's plan of reorganization discharged all claims against employees "of the Debtors who acted in such capacity on and after [January 6, 2009] . . . from any and all Causes of Action whatsoever in connection with, or related to, the Debtors . . . that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to [April 30, 2010]." (Bianchetta Mem. 14 (quoting *In re Lyondell Chem. Co.*, No. 09-10023 (REG), at Ex. A pp. 84-85 (Bankr. S.D.N.Y. Apr. 23, 2010) (the "Lyondell Chapter 11 Plan")).

Defendants claim that either the Bankruptcy Court's confirmation of the plan of reorganization constitutes a final judgment on the merits with *res judicata* effect or, alternatively, that Smith has waived any claims against Defendants by failing to file an objection in the bankruptcy proceedings. These arguments are unpersuasive.

Smith filed his Amended Complaint on April 20, 2010 – well after the Bankruptcy Court's April 16, 2009 order. Upon being served with the Amended Complaint, Defendants did not move to dismiss it on *res judicata* grounds. Instead, they each answered the Amended Complaint without asserting a defense of *res judicata* or in any way referencing any orders of the Bankruptcy Court. There is no indication that

15

Defendants raised this issue at all until filing their motions for summary judgment. The defense of *res judicata* is an affirmative defense that can be forfeited unless it is set forth in a pleading. *See* Fed. R. Civ. P. 8(c); *Arrow Gear Co. v. Downers Grove Sanitary Dist.*, 629 F.3d 633, 638 (7th Cir. 2010). Accordingly, the defense in this case has been waived.[2]

At any rate, Defendants fail to cite to any support for their argument that an employer's reorganization plan can impede the rights of litigants against individual employees under Section 1981. Moreover, to the extent such a broad order is permissible, the order entered by the Bankruptcy Court in Lyondell and Equistar's bankruptcy proceedings specifically excludes claims against employees for "causes of action arising out of the actual or intentional fraud, gross negligence, willful misconduct, or criminal conduct of any such Person." *See Lyondell* Chapter 11 Plan at 85. Discriminatory and/or retaliatory conduct is a form of willful misconduct. *See Carver v. Sheriff of LaSalle Cnty.*, 243 F.3d 379, 384 (7th Cir. 2001).

Thus, Defendants cannot prevail on summary judgment on the theory that Smith's claims are barred by an order entered in Equistar's bankruptcy proceedings.

### *Count I*

Count I asserts a claim of discrimination against Binachetta. Smith claims Bianchetta is responsible for terminating him on the basis of his race and for subjecting him to a hostile work environment. An employee claiming race-based employment

---

[2] After Smith filed his briefs in opposition to their motions for summary judgment, both Defendants moved for leave to amend their answers to include the affirmative defense of *res judicata*. The motions were denied.

discrimination under § 1981 can successfully oppose a motion for summary judgment in two ways: by showing direct evidence of discrimination or by establishing a case of discrimination under the indirect method of proof. *Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 849-50 (7th Cir. 2010) (*Egonmwan*).[3] Under the direct method, a plaintiff must present evidence that directly reveals an intent to discriminate or strong circumstantial evidence that an employment decision was driven by racial animus. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005).

Among other things, Bianchetta argues that he played no role in the decision to terminate Smith's employment. Rather, Bianchetta asserts that decision was made by the Plant Manager, Regional Human Resources Manager, Vice President of Human Resources, and Equistar's legal department – but not by Bianchetta himself. Smith argues that he has identified sufficient evidence of Bianchetta's participation to warrant submitting the question to a jury.

"[K]nowledge alone does not equate to an allegation that [defendant] himself participated in the illegal acts." *Behnia v. Shapiro*, 961 F. Supp. 1234, 1238 (N.D. Ill. 1997) (citing *Daulo v. Commonwealth Edison*, 892 F. Supp. 1088, 1091 (N.D. Ill. 1995) (*Daulo*)). However, Smith is not alleging that Bianchetta was merely aware of the decision to terminate Smith; he alleges that Bianchetta, as Smith's supervisor, played an actual role in the termination decision.

Smith has identified evidence that Bianchetta had racial animus toward Smith, and there is some evidence that Bianchetta was in a position to influence decisions

---

[3] The requirements for proving discrimination are the same whether asserted under Title VII or § 1981. *Egonmwan*, 602 F.3d at 850 n.7.

regarding the discipline of employees on his shift. At the very least, the evidence shows that Bianchetta is responsible for investigating complaints on his shift and that he communicates with Human Resources about problems with his employees. Additionally, though Bianchetta denies making such statements, Smith has identified evidence that Bianchetta said he was going to "get" Smith, that Bianchetta told Smith he thought he was faking his illness, and that Bianchetta instructed the employees on Smith's shifts not to take any calls from Smith if Smith tried to call in during his absence. Smith also points to evidence that implies Bianchetta had discussed with Bray firing Smith.

When evidence of Bianchetta's effort to "get" Smith is combined with evidence of Bianchetta's frequent racist comments to Smith, a triable issue of fact exists as to whether Bianchetta actively sought to end Smith's employment for racist motives and whether those efforts contributed to the decision to terminate Smith's employment despite Smith's unexcused absence. At this stage, those factual disputes must be resolved in Smith's favor. Thus, Smith has identified sufficient direct evidence of discriminatory termination to present his case to the jury, and it is unnecessary to analyze this claim under the indirect method of proof.

Count I also includes a hostile-work-environment claim, alleging that Bianchetta engaged in a continuous pattern of racial harassment. Bianchetta's only argument against that claim for purposes of his motion for summary judgment is that it is barred by the four-year statute of limitations. *See Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369, 383-84 (2004). Because Smith filed his Amended Complaint on April 20, 2010, any discrete acts of discrimination that occurred prior to April 20, 2006, would generally be

18

outside the statute of limitations. However, "a hostile environment is one wrong, [such] that an employee therefore may file . . . suit (under § 1981) within the statutory time from the last hostile act." *Pruitt v. City of Chi.*, 472 F.3d 925, 927 (7th Cir. 2006) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-21 (2002)).

Bianchetta asserts that Smith cannot identify any evidence of such a last hostile act occurring between April 20, 2006 – the earliest date that is within the statute of limitations – and June 18, 2006 – the day that Smith stopped going to work. Although Smith's evidence is short on specifics, Smith does cite his own testimony that not a week went by when he was not harassed by Bianchetta. This is arguably supported by the testimony of a coworker, who said that arguments between Smith and Bianchetta got worse toward the end of Smith's employment and occurred almost weekly. Smith has identified enough evidence to withstand summary judgment on the issue of whether his hostile-work-environment claim is time barred. A question of fact remains as to whether Bianchetta engaged in any harassing conduct after April 20, 2006. Thus, whether Smith's claim of a hostile work environment was brought within the statute of limitations remains for a jury to decide.[4]

---

[4] To the extent Count I can be read to state a claim regarding any discrete, adverse-employment actions other than termination (e.g., reassignment of duties, denial of promotion, removal from a major project), those claims are time barred because these acts undisputedly occurred more than four years before Smith filed his Amended Complaint.

*Count II – Bianchetta*

Smith also claims he was terminated in retaliation for complaining about discrimination at Equistar and that Bianchetta was responsible for the decision to terminate him.

Similar to his claim for discriminatory termination, Smith may overcome a motion for summary judgment on a retaliation claim under the direct method of proof or the indirect method of proof. *Metzger v. Ill. State Police*, 519 F.3d 677, 681 (7th Cir. 2008). Under the direct method, Smith must show, through direct or circumstantial evidence: (1) that he engaged in statutorily protected activity, (2) that he suffered an adverse employment action, and (3) that there was a causal connection between the two. *Id.*

Under the direct method of proof, there is no real dispute that Smith complained about perceived discrimination and that he was terminated after doing so. Bianchetta argues, however, that Smith has no proof of the third element under the direct method: a causal connection between Smith's complaints and Smith's termination.

Again, Bianchetta argues that Smith was terminated for being absent without leave and that Bianchetta took no part in the decision to terminate him. As discussed above, Smith has identified evidence that Bianchetta was out to "get" him after he complained about discriminatory harassment, that Bianchetta did play some role in disciplinary decisions, and that Bianchetta expressed satisfaction to Smith and his coworkers as a result of Smith's termination.

Bianchetta disputes that evidence and identifies significant evidence supporting his position that the only reason Smith was terminated was Smith's decision to stop working without any sufficiently documented medical condition. For purposes of summary judgment, however, Smith's version of the facts prevails. Smith has identified sufficient evidence to overcome summary judgment on his retaliatory-discharge claim against Bianchetta under the direct method of proof.[5]

*Count II – Bray*

Smith also claims retaliatory discrimination by Bray.[6] First, Smith alleges that Bray, "despite being aware of the worsened job conditions, failed to take corrective action." (Am. Compl. ¶ 60.) Smith argues that Bray fully investigated other employees' complaints and ignored his. This claim fails for several reasons. First, Smith cannot identify any time during the limitations period (i.e., after April 6, 2006) in which he complained to Bray about any alleged harassment. Second, the facts presented to this Court do not support Smith's contention that Bray ignored his complaints. Third, knowledge of discriminatory conduct by other employees is alone insufficient for a Section 1981 retaliatory discrimination claim. *See Daulo*, 892 F. Supp. at 1091. No personal liability may be imposed on a corporate official "when that official is not alleged

---

[5] In his response brief, Smith argues that Bianchetta waived any argument as to the direct method of proof on Smith's retaliatory-discharge claim. However, in his opening brief, Bianchetta stated, "Where, as here, there is no direct evidence of retaliatory conduct, Plaintiff must show [elements under the indirect method]." (*See* Bianchetta Mem. 4.) Moreover, despite asserting that the argument was waived, Smith argued that he could, in fact, succeed under the direct argument, to which Bianchetta then responded. Smith's waiver argument is overruled.

[6] Similar to his argument against Bianchetta, Smith argues that Bray waived any argument that Smith cannot show discrimination under the direct method of proof. That argument is similarly disregarded.

to have participated in the actual discrimination against the plaintiff." *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 753 (7th Cir. 1985). Accordingly, to the extent Count II is based on Bray's alleged failure to remedy Smith's problems with other employees, that claim fails.

Smith also alleges in Count II that Bray terminated him in retaliation for his complaints about discrimination and a hostile work environment. Like Bianchetta, Bray argues Smith was terminated for taking an unauthorized leave of absence and that she played no role in that decision.

Smith's only purported direct evidence of Bray's participation comes from Smith's own conclusory testimony that Bianchetta told Smith that "he and Bray already had decided Smith was fired" as soon as Smith went on sick leave. Bray correctly argues, however, that Bianchetta's statement is inadmissible hearsay to the extent it is being offered against Bray. *See* Fed. R. Evid. 801(d)(2) (providing that a statement is not hearsay if it is "offered against a party and is (A) *the party's own statement*" (emphasis added)); *see also United States v. Ramirez*, No. 06 CR 809, 2008 WL 4344901, at *1-2 (N.D. Ill. Mar. 18, 2008) (holding that a co-defendant, charged with the same charge as Defendant, is not a "party-opponent" of Defendant, and thus the co-defendant's testimony is excluded as hearsay against Defendant) (citations omitted).[7]

---

[7] Rule 801(d)(2) also exempts statements of which the party has manifested an adoption or belief in its truth, statements by persons authorized to make statements on a particular subject, statements made by agents within the scope of the agency relationship, and statements by coconspirators in furtherance of a conspiracy. None of those exceptions apply in this case.

Smith also claims there is circumstantial evidence that Bray participated in the decision to terminate Smith. Specifically, Smith points to Arrajj's and Purgason's statements regarding Bray's purported role in disciplinary decisions and the fact that Bray completed a report requesting his termination and signed the letter notifying him of his termination. As discussed above, Arrajj's testimony about Bray's role in disciplinary decisions, generally, is vague; and he specifically admitted that he was unsure as to what, if any, authority Bray had regarding termination decisions, specifically. Purgason merely testified that human resources managers, such as Bray, were involved in termination decisions to *some* degree. Smith's evidence is insufficient to show any factual dispute as to whether Bray caused his termination.

Furthermore, even if the evidence was sufficient to show that Bray did, in fact, cause Smith's termination, there is no evidence that she did so *because he complained about discrimination.* The undisputed evidence shows that Smith was absent for well over a month without leave and that a third-party administrator denied his claim for disability benefits. Equistar's plant manager then decided Smith should be terminated. There is no evidence that, despite his unexcused absence, Smith was actually fired because he complained to Bray. Without any evidence to support the essential element of causation, Smith cannot proceed against Bray under the direct method of proof.

Smith also contends he can proceed under the indirect method of proof, which requires him to identify sufficient evidence of the following: (1) that he engaged in a statutorily protected activity, (2) that he was performing his job according to Equistar's legitimate expectations, (3) that he suffered an adverse employment action, and (4) that

he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 785 (7th Cir. 2007) (*Nichols*). "Under the indirect method of proof, failure to satisfy any one element of the prima facie case is fatal to an employee's retaliation claim." *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004). If Smith establishes a *prima facie* case of retaliation, the burden shifts to Bray to produce a non-discriminatory reason for the employment action; if Bray can meet that burden, Smith must demonstrate that the proffered reason is pretextual. *Nichols*, 510 F.3d at 785.

At a minimum, Smith's claim falls under the indirect method of proof because Smith cannot identify a similarly situated individual who did not engage in protected activity and who was treated more favorably. Smith proffers only one purported comparator: Jason Corneglio, a Caucasian Operator in the Polypropylene Unit. Smith claims Corneglio is similarly situated because he also took a leave of absence from Equistar; and he claims Corneglio was treated more favorably because he, unlike Smith, was allowed to return to work after his leave. Corneglio's leave was approved, however, while Smith's was not. Therefore, the two employees are not similarly situated in all material respects. In fact, from 2003 through 2007, there is no evidence that any Equistar employee was allowed to return to work after a leave of absence that was unapproved and unsupported. Because Smith has no proof that he was treated less favorably than similarly situated employees, he fails to make a *prima facie* showing of retaliation under the indirect method of proof.

Accordingly, Smith cannot maintain his claim against Bray. Bray's motion for summary judgment is granted in its entirety.

### Constructive Discharge

As a final note, Smith also argues that he can succeed against both Defendants on an alternative claim of constructive discharge. A constructive discharge occurs when a plaintiff shows that he was forced to resign because his work conditions, "from the standpoint of a reasonable employee, had become unbearable." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 408-409 (7th Cir. 2008).

Smith's alternative claim that he resigned in June 2006 is in direct conflict with the evidence and with Smith's conduct in this litigation. Smith alleges that "Defendants terminated Mr. Smith's employment effective August 4, 2006." *See* Amended Compl. ¶ 45. He agrees that Defendants' assertions that he was terminated are "undisputed." He repeatedly testified at his deposition that he had been fired. He applied for benefits as a current employee. He called Bianchetta several weeks after his purported resignation and asked to be put on the schedule. As the Seventh Circuit has held, "We can make it no plainer than to reiterate that constructive discharge 'refers to a situation in which an employee is not fired but quits.'" *See Jordan v. City of Gary*, 396 F.3d 825, 836-37 (7th Cir. 2005) (quoting *McPherson v. City of Waukegan*, 379 F.3d 430, 440 (7th Cir.2004)). Accordingly, to the extent any of Smith's claims against either Defendant are premised on a theory of constructive discharge, Defendants are entitled to summary judgment.

## CONCLUSION

For the reasons stated above, Bianchetta's Motion for Summary Judgment is granted as to the constructive discharge claim and otherwise denied. Bray's motion is granted in its entirety.

Date: March 22, 2011

JOHN W. DARRAH
United States District Court Judge